JOSEPH· McMATH v. DAVID JOHNSON.

1. COVENANTS: INDEPENDENT: NO TENDER OR OFFER OF PERFORMANCE REQUIRED.—When covenants are independent, no tender · or offer of performance is required of either party before an action can be brought to enforce the covenant, and neither party can defeat the action by showing a previous tender or offer of performance on his part and a demand of performance by the party suing. The rule is not affected by the consideration that the party suing is unable to perform his part of the agreement.

2. SAME: DEPENDENT: PERFORMANCE OR TENDER OF PERFORMANCE REQUIRED.—When covenants are dependent, the party seeking to enforce performance by the other, must first perform, or tender and offer to perform, his part of the agreement and demand performance of the other, before he can bring an action, either at law or in equity.

3. VENDOR AND VENDEE·: COVENANTS INDEPENDENT WHEN PURCHASE-MONEY PAYABLE IN INSTALMENTS.—When the vendee of land executes his notes in instalments to secure the payment of the purchase-money, and takes a bond from the vendor, conditioned to make title when the last instalment is paid, the covenants are independent, and the vendor may enforce payment without performance, or an offer and tender of performance, of his part of the agreement. *Gibson* v. *Newman*, 1 How. Miss. 341; *Coleman* v. *Rowe*, 5 ib. 460; *Clopton* v. *Bolton*, 23 Miss. R. 78.

4. SAME: COVENANTS DEPENDENT, WHEN.—When the purchase-money is not paid in instalments, the covenants to pay and to make title are dependent, and .the vendor must show performance, or a tender and offer to perform, before he can enforce payment from the vendee.

5. *Pegues* v. *Mosby*, 7 S. & M.ˉ 540, and *Feemster* v. *May*, 13 ib. 275, overruled.

6. SLAVERY: ABOLISHED BY THE CONVENTION OF 1865, AND NOT BY THE PRESIDENT'S PROCLAMATION.—The abolition of slavery in the State of Mississippi dates from the ordinance of the convention of August, 1865, and not from the proclamation of President Lincoln in January, 1863.

7. CONSIDERATION: CONFEDERATE MONEY.—Executory contracts founded on the consideration of Confederate money are valid. *Green* v. *Sizer*, 40 Miss. R. 530.

ERROR to the Circuit Court of Carroll· county. Hon. Wm. Cothran, judge.

*J. Z. George* for plaintiff in error.

The distinction must be borne in mind, in construing title bonds and promises to pay the purchase-money, as to whether

the obligation to convey and the promise to pay be dependent or
not, between defaults on the part of vendor able to convey, but
failing to do it, and defaults of the vendor when he has no con-
tract to convey for want of title.    In the first class of cases,
that is when the vendor has a title and is able to convey accord-
ing to the term of his bond, then if the purchase-money be
payable in instalments, and the obligation of the vendor is to
convey upon payment of the purchase-money, it is clear that all
the instalments except the last are payable and recoverable,
independent of the covenant to make a conveyance.    And all
such preceding instalments may be collected by action at law,
without any offer to convey upon the part of the vendor.    The
last instalment only, and the covenant to convey, are considered
as dependent and mutual.    But the rule is very different in
such cases, when there is a want of title in the vendor, so that
he cannot convey.    Even in cases when the purchase-money is
payable by instalments, and the covenant is to make title on
payment of the purchase-money, the court holds that although
an actual conveyance of title must not be tendered, except to
collect the last instalment, yet the covenant means that the
vendor has ability to make title, and that this part of the cove-
nant is to be regarded as mutual and dependent with the prom-
ises to pay the purchase-money in all the instalments.    And
hence that none of the instalments can be collected when
there is a want of title on the part of the vendor.    This doc-
trine is expressly held in *Peques* v. *Mosby*, 7 S. & M. 340; and
*Feemster* v. *May*, 13 ib. 275.

In the first case above stated, the suit was on two notes,
being the two instalments of the purchase-money.    The condi-
tion of the title bond was to make title when the last instal-
ment was paid.    Plea non assumpsit, and verdict and judgment
for defendants, upon proof alone that vendor had no title; and
this judgment was affirmed.

In *Feemster* v. *May*, 13 S. & M. 275, the action was on the
last of a series of notes given for the purchase-money.    The
defence was that the vendor had no title.    This was sustained,
the court holding that the covenant to make a good deed meant

a covenant to make a good title. In that case there was no question about a tender of a deed, or an offer to perform on the part of the vendor.

The case seems to be imperfectly reported, and it would appear that a deed was offered; and it was held not sufficient, because it would convey no title. See also *Hill* v. *Samuel,* 32 Miss. 307; *Walton* v. *Wilson,* 30 ib. 576; Coleman v. *Robinson,* 34 Miss. 141; *Arthur* v. *Pearson,* 32 ib. 131; Story cn Sales, 376 *b*; *Judson* v. *Watts,* 11 Johnson R. 528; *Souter* v. *Drake,* 27 E. C. L. R. 420.

These cases clearly establish the proposition that the implied covenant of ability to make title and the promises to pay any and all of the instalments are mutual and dependent, and that whenever there is a want of ability to make title, there is an inability to collect any portion of the purchase-money.

The first plea avers that Lenville has not made a title, and that " he cannot do so," and that no person has made it for him. The averment sufficiently shows want of title. It is probably inartificially made, but no objection to it is made in the causes of demurrer assigned. No eviction is necessary when a title bond is given. See *Feemster* v. *May,* ut supra.

Nor is an offer to return the property. *Keys* v. *Mobly,* 13 S. & M. 677. In contracts of this sort the covenant of the vendor is the consideration of the power of the vendee. There is no actual sale in such a case; the title and property remains with the vendor. The plea avers, that " as the consideration of said bonds (the notes given for the purchase-money), that E. Lenville executed and delivered to the defendant his bond in the penalty of $28,000, conditional that he, the said E. Lenville, must make out a warrant title in fee simple to all said land, slaves and other property, so soon," etc.

So the plea distinctly avers that the title-bond was the consideration of the note or bond sued on. And it nowhere appears that there was any delivery of the slaves to McMath, and hence, even if such were the rule, in cases of delivery he was under no obligation to make an offer return—that which does not appear that he ever had.

This plea is, therefore, good, and the demurrer should have been overruled.

2d plea.

The 2d plea presents two other and additional questions.

It avers that the incapacity of Lenville to make title arose from the emancipation of the slaves, and it also avers that defendant, since the institution of the suit, tendered to the plaintiff the whole amount of the balance due on the purchase, including two other notes besides the one held by plaintiff, and that he made the same tender to the other holders of the two other notes, and offered to pay the same if this would make a title to the slaves, and that each and all of them would not and could not make a title ; that E. Lenville has been dead for several years, and has no administrator, and defendant could not make the united offer and demand of him. The plea avers, that all of said slaves were in Carroll county, in this State, on January 1, 1863, and so remained until after 21st August, 1865, and that they were emancipated by the Federal government on the 1st January, 1863, which said emancipation was ratified and confirmed by this State on 21st August, 1865.

The case of *Keys* v. *Mobly* (13 S. & M. 677) clearly settles this to be a good plea ; if the incapacity to make title by virtue of the emancipation be considered as such an incapacity as came within Lenville's covenant. It is there held, that though the covenant be independent, yet if the vendee tender the purchase-money and demand a title, if the vendor be unable to make it he cannot recover. See also *Peques* v. *Mosby,* and *Feemster* v. *May, supra.*

The next and most important question is upon whom the loss of emancipation fell—on Lenville or his assignee, or upon the vendee.

I will consider this question first upon the hypothesis that there was a delivery of the slaves to McMath at the time of the purchase, and secondly, upon the hypothesis that there was no delivery, and that the covenant in the title-bond was the sole consideration for the note sued on.

The plea says that the defendant " contracted to purchase

from one E. Lenville a plantation," &c., and gave his seven bonds for the purchase-money, "and that as the *consideration* of *said bonds*, Lenville executed and delivered to defendant his bond in the penalty of $28,000, conditional that he, the said E. Lenville, would make a warranty title in fee simple" to the said property, "so soon as the defendant should pay said notes or bonds, as they fell due."

This agreement, thus pleaded, shows clearly that there was no absolute sale, only a conditional and executory one—an agreement to pass the property *in futuro*, and upon a condition precedent to be performed by defendant.

In such cases the vendor is still regarded, and is in law and in fact the owner of the property. *Servis* v. *Beatty*, 32 Miss. 52, 80, 81.

And this is so when the agreement respects personalty, and it makes no difference that there has been a delivery of the property to the vendee upon the conditions prescribed in the contract. See *Hussy* v. *Thornton*, 4 Mass. R. 405; *Marston* v. *Baldwin*, 17 ib. 606; *Whitwell* v. *Vincent*, 4 Pick. 449; *Ward* v. *Shaw*, 7 Wend. 404; *Gambling* v. *Read*, Meigs' R. 281; *Houston* v. *Dyche*, ib. 76; *Reed* v. *Upton*, 10 Pick. 523; *Barrett* v. *Pritchard*, 2 ib. 512; *Ayer* v. *Bartlett*, 6 Pick. 71; S. C. 9 ib. 156; *Harris* v. *Mount*, 1 S. & M. 185; 2 Kent's Com. (side page), 497; Chitty Cont. (side page), 354.

All these cases fully establish the position that the vendor is the owner notwithstanding a delivery.

And in *Gambling* v. *Read* (Miss. 281) it is expressly held that such an agreement is not mortgage though having some of the incidents of that security.

The vendor expressly refuses to part with his property, and retains it. Being owner, he refuses to part with his rights as such, and agrees only that he will cease to be owner in the future, upon the happening of a contingency.

Such being the relation of the vendor to the property, he must be held to the responsibilities and losses incident to his ownership, unless there be something in the agreement which puts them on the other party. There is no express agreement here

which does it—nor can it be implied. His contract is to pay upon the condition that the other party will at the proper time invest him with the ownership, and he has no right to the prop-- erty until that time.

The rule is clear that the risk of the property remains with the title. 2 Kent's Com. (side page)499 Pothier; on Sale, § 312.

But this if possible is more clearly the case when there has been no delivery. In such a case there can be no pretence that the vendor ought to lose the property, if it perish in any manner. The plea clearly shows that the consideration of the bond sued on was, the title bond of Lenville. A promise in consideration of a promise.

Lenville cannot comply with his promise, and never can, and hence the consideration has failed, and the plea was a good one.

This consideration applies equally to the 1st as the 2d plea.

The 3d & 4th pleas raise the question as to the date of the emancipation of slaves in Mississippi.

I insist that they are to be treated and regarded in our courts as having been emancipated on the 1st January, 1863, and hence that the assignment made of the note sued on, made on the 8th of that month, was on an illegal consideration and void.

Mr. Lincoln's proclamation issued on the 1st January, 1863, declares that all slaves in Mississippi and other States shall " henceforward be free."

In his proclamation of the 8th December, 1863, he prescribed an amnesty oath requiring the affiants to swear "that they would abide by and support all proclamations of the President made during the existing rebellion, having reference to slaves," so far and so long as not modified by decision of the Supreme Court.

Mr. Johnson's amnesty oath requires us "to abide by and support all proclamations made during the existing rebellion with reference to the emancipation of slaves," omitting the exception in relation to modifications made by the Supreme Court. I do not feel called upon to discuss the real question as to the constitutional power of President Lincoln to issue the

proclamation of 1st January, 1863. Whatever may have been its inherent and constitutional force, yet it has been enforced by conquest, and the conquered have been compelled to swear that they would abide by and support it.

The power of the conqueror in the late civil war to disregard the constitution, as to us, and to impose the conqueror's terms upon us, has been distinctly recognized, by this court in *Scott* v. *Belgerry*, and in *Murrill* v. *Jones.*

The President had certainly as much power to issue that proclamation as he had to appoint a governor in Mississippi— call a convention to remodel our constitution, prescribe qualifications of voters, levy taxes (as was done by Governor Sharkey), and establish courts, and confer on them jurisdiction. All these things it has been held he may rightfully do.

It will be argued that, Mississippi then being a hostile and foreign country, his proclamation was of no avail, until it was enforced by arms, which did not occur for eighteen months afterwards. This is true, and if we had succeeded in our efforts for independence, the proclamation would have had no vitality beyond the Federal lines, nor even within them, if we had recovered our lost territory, after our reoccupation, except by our consent. But since the conqueror succeeded, the result is different. The Southern people were treated by the national government in all its branches, in the double and inconsistent characters of traitors and as enemies. As traitors, the government claimed the right to punish us for resisting its constitutional authority by war; as conquered enemies, it claimed the right to impose on us such terms of peace as they saw proper. We were denied to have constitutional rights for our protection, and to this day we are held under a military government, and governed by martial law.

As a condition of pardon for our alleged offences during the war we were required to swear that we would abide by and support President Lincoln's proclamation of January, 1863. This oath was taken by every man who voted for members to the convention in 1865—sat in that convention, voted for State and county officers in October, 1865, or was elected to any such

office at that time. It may be held that the oath, being a promissory oath, only bound the affiant from the date of taking it. This is true in one sense. The oath referred to, and regulated, only *the future conduct* and action of the juror, but it did regulate that future conduct and action in all respects whatever, whether that conduct and action had reference to the present or past. That proclamation, by the oath, was made a fundamental law for the juror and for the State, and is as inviolable as the constitution itself, merely because we have been sworn to *support it*. If we had been merely required to abide by it—then if we had surrendered our slaves and recognized their freedom from the date of taking it, we would have complied with our oaths. The word support has a more extensive signification. It means exactly what the same word means in an oath to support the constitution of the State or the United States, and in fact that word is used in that oath, in reference to our maintenance of the constitution of the United States.

Now when a person or judge takes an oath to support the constitution, that is also promissory and refers to his future conduct and action alone; but it regulates that conduct and action with reference to all transactions, whether past or future. On the day he takes the oath, in giving judgment, if a judge, he is bound to enforce the rule prescribed by the constitution in reference to any transaction occurring after its adoption.

The constitution of the United States was adopted in 1787, and an oath to support it means to apply in all transactions, where it is applicable, occurring since 1787. Any act done in violation of it since 1787, must be held null, and any act which depends upon its provisions for its validity, if done since 1787, must be held valid.

North Carolina did not accede to the constitution for about two years after its ratification. Suppose the convention which framed it had claimed the power in the constitution to bind by its provisions all the thirteen States, upon its ratification by nine of them, and had so expressly ordained it in the constitution. What would have been the legal validity of an act done in violation of the constitution of North Carolina,

after the ratification by nine States, and before North Carolina acceded to it. Unquestionably in all courts, even in those of North Carolina after her adoption of the constitution, the act must have been held invalid.

The proclamation says, that all slaves in Mississippi, Alabama, &c., shall, on 1st January, 1863, and thereafter, "be free." We swore in 1865, to support that proclamation, as it was written, and according to its terms. How now can we say, in opposition to that proclamation, that the slaves shall not be considered and held from henceforth as free, on that day? To hold now, that they were slaves then, is to say in the face of our oath that we will not support it as it is written, but according to a state of supposed facts existing contrary to it.

The Parliament of Great Britain is supreme. It can enact *ex post facto* laws, or laws impairing the obligation of contracts. Suppose that in the act abolishing slavery in the British Empire, a clause had been inserted, declaring that all persons held as slaves should be considered, and held, and treated as free from a date eighteen months prior to the passage of the act, the law would have been valid, and so held by every court in Christendom, especially by a court whose members had taken an oath to support that very act.

But the British Parliament is not more unlimited in its power than the will of the conqueror.

Suppose that during the war the "*loyal* States" had amended the Federal constitution by appending a clause, that from and after the 1st day of January, 1863, all slaves in *Mississippi, Alabama,* &c., should be henceforth free." After conquest, the Federal government had required us to take an oath to support this constitution, and especially said appended article, what would have been the decision of a court then on this point?

The supremacy of the constitution in the courts rests upon the fact alone, that the judges are sworn to support it. And it appears to me to be impossible to draw any distinction between its supremacy, and that of the proclamation, since we are sworn to support both.

It is no answer to this to say that at the time this sale was

made the act was valid and legal, the United States authority having been expelled from Mississippi. The same objection might be made to an *ex post facto* law, or a law impairing the obligation of contracts, when passed by the British Parliament, and to an act done (in the case supposed) in North Carolina before her accession to the Union. The sole difficulty arises in squaring our ideas of constitutional law, which discards laws impairing the obligation of contracts, with this extra-constitutional act done in virtue of the unlimited power of a conqueror. We cannot easily comprehend the idea of subjugation and its consequences, and the mind involuntarily rejects the result, though they are upheld by the sanction of our oath.

This oath made the proclamation a fundamental law in Mississippi and the other seceding and conquered States. We were conquered, we were at the feet of the conqueror, who treated us both as enemies and traitors. He claimed the right, and had the power, to confiscate our property, and to punish us as traitors. He declared our government to be illegitimate, and overturned it and organized another in its stead. As a fundamental condition of pardon and reorganization, the people of the State were required to take the oath to support the proclamation. A convention was called to form a new constitution—the electors were required to take that oath—the members were required to take it. The convention met, organized; it did not abolish slavery. It recognized its abolition, and provided against its re-establishment. The language employed means this, and no more. The effort was made to emancipate the slaves—that fact has been accomplished and the convention merely recognized. The proclamation did not undertake to say that slavery should never thereafter exist in Mississippi. It merely emancipated those then held in servitude under it; it would have been perfectly competent for a citizen of the State to have gone to Kentucky and remove slaves from that State to this. The convention provided against this by declaring that slavery should not hereafter exist in Mississippi.

This is a solemn recognition of the emancipation under the proclamation. Our present State government is framed on this idea.

McMath *v.* Johnson.

But the argument "*ab inconvenienti*" may be urged in opposition to this view. To this I answer, that whether we look to Federal or Confederate policy, it appears to be most just that these contracts should not be enforced. A traffic in slaves, since 1863, was a mere wager on the result of the war. It was an assertion of right in opposition to the Federal policy and laws.

That the purchaser should be released from his contract can certainly offend no sentiment or violate any policy which we have as Confederates, for it relieves him who trusted his fortunes to a cause which was deemed by us as just. Relief unsettles no rights, produces no litigation. It leaves parties where they were when the contract was made. In *pari delicto potior est conditio defendentis.*

But even considering this contract as valid, is it not clear that it is manifestly against our policy now to enforce it? Can a policy be more clearly marked out than ours on that subject, when the whole population has been sworn to observe it?

*Walthall & Brantley* for defendant in error.

It was not the intention of the seller to warrant against the action of the government, when he undertook to make title to the slaves. Covenants are to be construed, as near as possible, by the obvious intention of the parties, which must be gathered from the whole context of the instrument, interpreted according to the reasonable sense of the words. A just construction is favored, rather than a technical one. 10 S. & M. 560 and 615; 9 Yerger, 276; 12 Pennsylvania (2d Jones), 80; 5 Porter, 318.

The default of the seller, if any, has been technical, not substantial; and if the consideration of the writing obligatory, sued on, has failed, it has been but a nominal failure, not to the prejudice of plaintiff in error's right. He has lost nothing but a paper title; for the action of the government, in freeing the slaves, would have affected his rights in the same manner, and his loss of property in the slaves would have been just the same if the title had been made to him, as it is without it.

29

There has been no eviction, and it is not alleged that the status of the negroes, when sold, was not the status of slaves, or that they were claimed by any person claiming by title paramount, or that the seller's title was not, in all things, perfect. The seller, therefore, is not in default.

If the defendant has suffered by not having a proper title made to him, it has been the result of his default of making payment January 1, 1863, when his note matured; for then the seller could have made it. "In all cases whatever, a promissor will be discharged from all liability when the non-performance of his obligation is caused by the act or the fault of the other contracting party." 2 Parsons on Cont. 189.

The covenant to make title to the slaves is repealed by law. "If one agree to do a thing which it is lawful for him to do, and it becomes unlawful by an act of the legislature, the act avoids the promise." Bacon's Ab't Covenant, G.; 2 Parsons on Con. p. 186; Chitty on Cont. side p. 604–5; 5 Cowan's Reports, p. 538; 7 ib. 585; 5 Porter, 322.

The covenants in this case are mutual and independent, and the purchaser's obligation was *to pay at all events*, the seller's non-performance furnishing him no excuse.

"If a day be appointed for the payment of money, or part of it, or for doing any other act, and the day is to happen, or may happen, before the thing, which is the consideration of the money, or other act, is to be performed, an action may be brought for the money, or for not doing such other act, before performance; for it appears that the party relied upon his remedy, and did not intend to make the performance a condition precedent." See *Gibson* v. *Newman*, 1 How. 349 and cases cited; *Coleman* v. *Rowe*, 5 How. 466. In both these cases, the court has held that an agreement to pay by instalments makes the covenants independent, as by doing so the party manifests his willingness to rely upon his remedy upon the security received from the other party for title, by parting with at least part of his money before performance could be demanded of the other party. This doctrine is distinctly reaffirmed in *Clopton* v. *Bolton*, 1 Cush. 79, and must now be regarded as the settled

rule of this court.  In the last case the action was on two writings obligatory, payable twelve and twenty-four months after date, given for land.  The defendant pleaded that the plaintiff had executed a bond to make title when the purchase-money should be fully paid, and that he did not tender a deed to defendant for the land before bringing his suit. .

The court says:  " On this plea the point presented is, whether this action can be sustained because of the failure to tender a deed before the suit was brought.  In our opinion it constitutes no bar.  According to the case of *Gibson* v. *Newman*, 1 How. 341, the covenant was separate and distinct.  On the one part, there were instruments for the payment of the purchase-money at several different periods ; on the other, an obligation to make title upon full payment of the purchase-money.  Suppose the suit had been brought as soon as the first payment fell due, would it be contended that the plaintiff should make a deed before he could recover that instalment, in the face of his obligation to make title when all the money was paid.  Clearly not. This shows beyond doubt that the covenants were intended to be independent."   See also Parsons on Contracts, 42 and 43, note.

The defendant in error is not deprived of the benefit of this rule, by the tender made by plaintiff in error and his demand of title ; for he is an assignee, and is not the party bound to make the title.   Besides this, he had no authority to receive the money due the other holders when tendered, and so long as any of the notes were unpaid, there was no obligation on any one to make title.

This contract is entire and not capable of severance, and therefore the plaintiff in error cannot in a court of law set up a failure of title to part of the property while he holds the remainder.   See authorities cited in notes to section on " Entirety of Contract."   2 Parsons on Cont. p. 30, especially *Boone* v. *Eyre*, 1 Henry Blackstone and those cited in note on p. 44, and *Parham* v. *Randolph*, 4 How. 435-453.

As to the effect of the emancipation proclamation on the negro, alleged to have been the sole consideration for the trans-

fer of the note, it is submitted that this war measure was but a declaration, and could not of itself have the effect here claimed for it.   Practically it accomplished nothing, and could accomplish nothing in any locality, until it was made operative there, by the permanent establishment of United States authority.  If slavery was abolished in Mississippi before the action of the convention in August, 1865, it was when General Dick Taylor surrendered, and the authority of the United States was established in May preceding.

The plea setting up that the consideration for the transfer of the writing obligatory sued on was Confederate money in part is disposed of by *Green* v. *Sizer,* decided last winter.

ELLETT, J., delivered the opinion of the court.

Johnson sued McMath, in March, 1866, on a sealed note for $2,000, dated November 20, 1856, made by McMath, payable to Martha Ann Lenville or bearer, and due January 1, 1853, of which plaintiff was the legal bearer and owner ; and also on a due bill, given by defendant to plaintiff, dated December 21, 1863, for $80.19.

The defendant pleaded four pleas.

The first plea alleged, as the consideration of the instruments sued on, that on the 20th of November, 1856, the defendant contracted to purchase from E. Lenville, certain land, slaves, stock, &c., for the sum of $14,000, which sum was secured by seven bonds of the defendant for $2,000 each, of that date, and due January 1, 1858--9--60--61--62--63 and 64, of which the bond sued on was one, and was made payable to Martha A. Lenville, a daughter of E. Lenville, by his direction, as a gift by him to her.   That the said E. Lenville, on the same date, as the consideration of said bonds, executed and delivered to defendant his bond, in the penalty of $28,000, conditioned that he would make a warranty title in fee simple to said land, slaves, &c., so soon as the said defendant should pay said notes or bonds, as they fell due.   That defendant has paid all the said notes or bonds, except three, to wit : the one now sued on, and those due respectively in 1863 and 1864, and except also the

McMath v. Johnson.

sum of $80.19, parcel of one of the other bonds, and for which the one bill sued on was given; and has also made partial payments on the others, making, in all, payments of $8,349.13, and leaving a balance of $5,650.87 of the principal sum unpaid. That the said slaves were estimated in said sale, and were worth over $10,000, which greatly exceeds the balance now due of the principal, together with the sum of $1,300, the value of one of the slaves which was sold by defendant with the consent of E. Lenville. And the plea further avers, that the said E. Lenville did not, and has not, made a good warranty title to said slaves to the defendant, nor can he do so, nor has any other person made such title for said Lenville. And the plea states that Johnson, the plaintiff, became the holder of said bill single after it had become due and payable by assignment from the payee.

The second plea is similar to the first, except that it contains the further averments that said slaves were all in Carroll county, in this State, on the 1st of January, 1863, and so remained until after the 21st of August, 1865, and that they were emancipated by the action of the Federal government on the 1st of January, 1863, which emancipation was ratified and confirmed by this State, on the 21st of August, 1865. And that, since the last term of the court, defendant had tendered to plaintiff the whole amount of his indebtedness on said note and bond, and on the two other bonds not paid as before stated, and demanded from him a title to said slaves, and offered to pay said balance if he would make said title; and that he made the same tender, offer and demand, of the said Lenville, the holder of the bond due on 1st January, 1862, and to the attorney of the owner of the bond due 1st January, 1864; but neither of them would or could make a title to said slaves, but wholly failed to do so; and that E. Lenville has been dead for several years, and has no administrator, and defendant could not make the same tender to him.

The third plea, as to the bond of $2,000, alleges that plaintiff is not the lawful holder thereof, but the same is the property of the payee, now Mrs. Crayton, and that the same was assigned and delivered to plaintiff by her husband, on the 8th of Jan-

uary, 1863, in consideration of a negro, then sold by plaintiff to Crayton, which negro was then a resident of said county of Carroll, and in further consideration of the sum of $400 then and there paid in Confederate treasury notes, the circulation of which was illegal, and that the assignment was therefore void.

The fourth plea, to the said bond of $2,000, assails the validity of the assignment of the note, on the ground that the same was made in consideration of a sale of a negro in said county and State, after the first of January, 1863, which negro had been a slave, but was then a freedman, under the laws of Congress and the proclamations of the President of the United States, and that the assignment was therefore void.

These pleas were all demurred to by the plaintiff, and the demurrers were sustained, and final judgment given for the plaintiff, the defendant refusing to plead over. The action of the court on these demurrers is assigned for error.

It is insisted on the part of the plaintiff below, that the covenants of the defendant to pay the purchase-money in seven annual instalments, and the covenant of Lenville, the vendor, to make title, are mutual and independent covenants, and that consequently the failure or inability of the vendor to make title, cannot be set up by the vendee as a defence at law against the payment of the purchase-money. On the other hand, it is insisted for the defendant below, that there is a distinction between cases of default on the part of a vendor able to convey, but failing to do it, and defaults of a vendor, where he has no capacity to convey for want of title, and that none of the instalments can be collected when there is a want of title in the vendor.

This question has been frequently before this court, and it is to be regretted that there exists an apparent want of uniformity in the decisions. It first arose in the case of *Gibson* v. *Newman*, 1 Howard, 341, and appears to have been well argued, and carefully considered by the court. The purchase-money of a lot of ground was in that case agreed to be paid in three annual instalments. No deed was executed, but the vendor promised to make a good title. It did not appear whether this promise was in writing, nor was any time stated when the title was to

be made, but the court assumed that it was to be done when the last payment became due. The suit was brought to recover the last two instalments, the first having been paid, and the plea alleged a readiness to pay, a demand of title, and a refusal by the vendor to make it. The opinion of the court, delivered by Chief-Justice Sharkey, contains a very satisfactory exposition of the principles of law applicable to such cases. It is held to be immaterial whether the vendor has title or not, at the time of the sale, and that it is sufficient if he is prepared to make the title at the time when he has contracted to do so. The general principle stated in the note of Sergeant Williams to the case of *Pordage* v. *Cole,* 1 Saund. Rep. 319, note 4, that, "if a day be appointed for the payment of money, or a part of it, or for doing any other act, and the day is to happen, or may happen, before the thing which is the consideration of the money, or other act, is to be performed, an action may be brought for the money, or for not doing such other act, before performance; for it appears that the party relied upon his remedy, and did not intend to make the performance a condition precedent; and that it is so when no time is fixed for the performance of that which is the consideration of the money or other act," is cited and approved by the court, and it is held that an agreement to pay by instalments, or at different times, will make the covenants mutual and independent, as by so doing the party has manifested a willingness to rely on the covenant or promise of the other contracting party for title or performance.

The subject was again carefully re-examined in the case of *Coleman* v. *Rowe,* 5 How. 460, and the case of *Gibson* v. *Newman* was re-affirmed. The contract was to pay part of the purchase-money in cash, and the residue in two equal annual instalments, and a bond was given for the title. After a review of the authorities, the conclusion is stated, that the contract to pay the money was independent of the covenant of the other party to make a title. "He (the vendee), it is said, agreed to pay the money at all events, and relied upon the covenants in the bond for title." In both these cases, the defence relied on

the allegation that the vendor had no title, and was unable to convey.

The same question came again before the court in the case of *Clopton* v. *Bolton*, 23 Miss. 78, which was an action on *two* writings obligatory, payable twelve and twenty-four months after date, given for the purchase of a tract of land. The defendant pleaded that fact, and that the plaintiff, at the time of the contract, executed a bond to make title when the purchase-money should be fully paid; and that the plaintiff did not, before the bringing of this suit, tender a deed to the defendant for the land. The court expressly reaffirm the cases of *Gibson* v. *Newman* and *Coleman* v. *Rowe*, and hold that, as on the one part there were instruments for the payment of the purchase-money at several different periods, and on the other, an obligation to make title on full payment of the purchase-money, it is clear, beyond doubt, that the covenants were intended to be independent, and that the failure to tender the deed constitutes no bar to the action.

It is to be observed, that, where the covenants are dependent, the party seeking to enforce performance by the other, must first perform, or tender and offer to perform, his own part of the agreement, and demand performance by the other party, before he can bring any action, at law or in equity, against him. It is not necessary, in order to defeat such an action, that the defendant should have tendered performance on his part, nor will such tender make his case any stronger before the court. It is sufficient, in all such cases, for the defendant to show that the covenant sued on was dependent upon another covenant to be performed by the plaintiff, and this will throw upon the plaintiff the burden of proving that he performed, or offered to perform, his own covenant before the commencement of the action, for, without such proof, the defendant was in no default, and no cause of action had accrued.

And if the covenants are independent, then each party relies on the covenants of the other party; no tender or offer of performance is required of either, before resorting to an action; and neither can defeat the action of the other by showing a

previous tender or offer of performance on his part, and demand of performance by the party suing. Chitty on Contracts, 809, 810.

This constitutes the main, if not the only distinction between dependent and independent covenants, and is fully recognized in all the decisions above quoted; and it is not at all affected by the consideration whether the party contracting is able to perform or convey, or whether, being able, he merely refuses to do so.

The cases cited would seem to be sufficient to settle the law of this State on the subject, but two decisions are relied on as establishing a different rule. The first is that of *Peques* v. *Mosby*, 7 S. & M. 340, in which the purchase-money was payable in two annual instalments, and a bond was given for title when the last note should be paid. The court below was asked to instruct the jury that the covenants were independent, and one of the instructions was in the very language of the court in the case of *Gibson* v. *Newman*. The instructions were refused, and the judgment was affirmed by this court. All that is said by the court in the opinion is this : " The instructions asked for and refused, assert the proposition that the right to enforce payment is distinct and independent from the ability to make title, and hence the want of title cannot be used as a defence. These charges were properly withheld. Courts will construe covenants to be dependent, unless a contrary intention clearly appears. A party is not thus forced to pay out his money, unless he can get that for which he stipulated."

The facts of this case are not distinguishable from those in the cases of *Gibson* v. *Newman*, and *Coleman* v. *Rowe*. In all of them the suit was brought after the maturity of the last instalment of the purchase-money, and in all, the inability of the vendor to make the title was relied on by the defence. But in the last case the distinction drawn in the two former cases does not occur to have been adverted to, to wit, that the fact of the purchase-money being made payable by instalments, is regarded as conclusive proof of an intention that the covenants are to be independent ; and the subsequent emphatic reaffirm-

ance of this rule in the case of *Clopton* v. *Bolton* shows that there has been no intention at any time to disturb it. So far as the case of *Peques* v. *Mosby* is to be considered as an infringement upon the general principle so clearly established, it has not been followed, and we do not feel inclined now to return to it.

Similar remarks are applicable to the case of *Feemster* v. *May*, 13 S. & M. 275. That was an action upon the last of a series of notes given for the purchase-money of a tract of land, and there was a bond to make title as soon as the notes should be fully paid. The ruling of the court upon these facts is, that "where no deed has been executed, but only a bond given for title, the covenants are dependent, and the party cannot be forced to part with his money until the vendor is ready to make title." This case seems to go upon a different ground from the case of *Peques* v. *Mosby*, and to be made to depend upon the fact that a bond was given for title, not upon the presumed intention of the parties; and it equally overlooks the important distinction already adverted to.

There are two other decisions reported in 3 Howard, to wit: *Leftwich* v. *Coleman*, and *Rector* v. *Price*, both of which recognize the rule of the independence of the covenants when the purchase-money is payable by instalments. Such was the fact in both cases, and although some of the expressions used by the court might seem to extend the rule beyond that limit, yet it is well settled that the general language employed in an opinion is to be restricted in its application to the facts of the case.

It is expressly declared in *Clopton* v. *Bolton*, that the case of *Wadlington* v. *Hill* (10 S. & M. 560) was not intended in the slightest degree to shake the decisions in *Gibson* v. *Newman* and *Coleman* v. *Rowe*, and that there is no repugnancy or contradiction between them. In *Mobley* v. *Keys* (13 S. & M. 677), cited and relied on by the plaintiff in error, the purchase-money was not payable in instalments. There was but *one note*, and the bond was given for title to be made as soon as the money should be paid, and these agreements were very properly held to be dependent.

Adhering as we do to the doctrine as finally laid down in *Clopton* v. *Bolton*, we think that the first and second pleas were not sufficient to bar this action, and that the demurrers were properly sustained.

The third and fourth pleas assert the title of the defendant in error, to the bill single for $2,000, on the ground of the illegality of the consideration of the assignment. They allege, in substance, that the assignment was made after the first of January, 1863, and that it was made in consideration of the sale of a negro by the assignee to the assignor, and of the payment of a sum of money in Confederate States treasury notes; and that the negro was then a freeman by virtue of the acts of Congress and the proclamations of the President, and that the passing of Confederate notes was illegal.

We are not furnished with the acts of Congress, or the proclamations of the President referred to in the pleas, and we have no access to them where the court is held, and we are therefore unable to state their terms or import. Reference is made in the brief of counsel, in general terms, to a proclamation said to have been issued by President Lincoln, whereby all the slaves in the State of Mississippi were declared to be free on the first day of January, 1863, and this is relied on to establish the emancipation of the slave in question anterior to the day of the alleged sale.

We believe the most liberal advocate of Federal power has never contended for the constitutional authority of the President to issue such a proclamation, except as a war measure, or that it would have any legal force beyond the lines of actual occupation of the country by the forces of the United States. It is not necessary for us now to inquire whether the President possessed any such authority, by virtue of the war-making power, or otherwise, even within his own military lines. For it is not alleged that the county of Carroll, in which this negro remained, and in which this transaction occurred, was at any time during the war within the occupation, or subject to the dominion, of the military power of the United States.

Nor can these pleas derive any support from the subsequent

action of the people of Mississippi, in the convention of August, 1865. That convention did not undertake to ratify or confirm the acts of President Lincoln, but themselves, by a new and original provision, embodied in the fundamental law, struck down and abolished the institution of slavery within the State. That act has no retrospective operation, and it is from its date alone that the emancipation of the slaves took effect.

The question of the sufficiency of Confederate money, as the consideration of a contract of this sort, has already been settled by adjudication in the case of *Green* v. *Sizer*.

The judgment of the court below will therefore be affirmed, it being unnecessary to discuss other important questions raised in argument.